Clay Estate.

184

Argued January 16, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Donald B. Corriere,* with him *Thomas C. Kubelius,* for appellant.

*David M. Kozloff,* with him *James W. Stoudt, John W. Biehl,* and *Rhoda, Stoudt & Bradley,* for appellees.

OPINION BY MR. JUSTICE COHEN, April 22, 1970:

This is an appeal from a decree of the Orphans' Court Division of the Court of Common Pleas of Berks County specifying the manner in which the estate of Emma Clay is to be distributed. Appellant, Beatrice Binkley, daughter of the deceased, objects to the lower court's determination that she is not entitled to any part of $9,724.99 which was deposited in a savings account in the name of the deceased.

Emma Clay owned premises at 315 Brobst Street, Shillington, Berks County, Pennsylvania, and on November 21, 1958, she conveyed title to the premises to herself and her daughter, appellant, as joint tenants with right of survivorship. On November 5, 1963, the joint tenants along with appellant's husband conveyed title to the premises to Charles and Mary Schaffer. A check for the proceeds of the sale in the amount of $9,724.99 was issued to and endorsed in blank by Emma Clay and Beatrice Binkley and was deposited in a savings account in the name of Emma Clay alone in the First National Bank of Allentown. The proceeds remained in the account of the decedent until her death on October 23, 1967.

Appellant filed objections to the final account of the executors whose proposed distribution did not provide for her receiving any part of the $9,724.99. On February 3, 1969, the court confirmed the account nisi and on May 1, 1969, dismissed appellant's exceptions.

The first issue that must be resolved is as to which party bears the burden of proof. It is appellant's position that a joint tenancy existed prior to the sale of

the premises and that appellees have the burden of showing how that tenancy was severed. She contends that there is no evidence of severance by mutual consent, of severance by one tenant conveying his estate to a third person, or of severance by one tenant, without the other's consent, appropriating the property to his own use. Therefore, she argues, the joint tenancy continued in the proceeds and as the survivor she is entitled to the full amount. Even if there were a severance, she argues, she would be entitled to one-half of the fund as a tenant in common, and that the burden would be on appellees to show that she had relinquished this interest by gift. *Ford Estate,* 431 Pa. 185, 245 A. 2d 443 (1968); *Tradesmen's National Bank and Trust Company v. Forshey,* 162 Pa. Superior Ct. 71, 56 A. 2d 329 (1948). In essence, she is saying that appellees have the burden of showing how she lost what she once had.

Where appellant goes astray is her ignoring the crucial fact that when Emma Clay died the money was in a savings account in the name of the decedent alone. It is true that in *Culhane's Estate,* 334 Pa. 124, 5 A. 2d 377 (1939), we placed the burden of proof on the accountant rather than on the claimant. In that case the decedent and claimant owned a bank account as joint tenants, and in 1934 the Secretary of Banking made a distribution of 33 1/3% to depositors. Decedent took that check and one from a later distribution (the checks were drawn to the order of Catherine Culhane or Grace Albracht), collected both and placed the proceeds in a safe deposit box which she rented in her name and that of a Mary Woods. At her death approximately two-thirds of the two distributions remained in the box, and we held that we would not presume that decedent intended to act unlawfully by diverting the joint property to her own use and that

the burden of proof was on the accountant and not on Miss Albracht, the claimant.

That holding, however, has been undermined by our decisions in *Hendrickson Estate,* 388 Pa. 39, 130 A. 2d 143 (1957); *Donsavage Estate,* 420 Pa. 587, 218 A. 2d 112 (1966), and *Pappas Estate,* 428 Pa. 540, 239 A. 2d 298 (1968). In *Hendrickson* the executor found a diamond ring in the safe at decedent's home. Decedent's daughter excepted to the inclusion of the ring in the account alleging that it had been given to her by her mother just prior to the mother's death sixteen years before. We stated, 388 Pa. at 42-43: ". . . the [lower] court found that the unexplained possession of the ring for 16 years by the decedent was sufficient to establish a prima facie case of ownership which cast upon the appellant the burden of going forward with the evidence. The executor having proven possession in the decedent at the time of his death, the burden shifted to the appellant to establish facts essential to the validity of her claim of ownership as a donee of the ring. * * * Listing of the ring in the inventory and the account was prima facie evidence of ownership. Such listing, coupled with 16 years of unexplained possession by the decedent, certainly sufficed to cast upon the appellant the burden of proof that she had become the owner of the ring by a donation from her mother."

In *Donsavage,* we stated, 420 Pa. at 593-94: "The fact that, at the time of death, stock is registered in the name of the decedent and was, concededly, possessed by him three days prior to his death gives rise to a *presumption,* rebuttable in nature, that the *ownership* of the stock was in the decedent. [citations omitted] Common sense dictates that, once it has been established by competent evidence or by admission, that stock certificates were registered in the decedent's name when he died and in his possession so shortly before he died, the person who disputes decedent's ownership of

the stock at that time must come forward with evidence to sustain such lack of ownership."

These cases stand for the proposition that courts must look at the apparent title as of the date of death and determine, prima facie, the state of ownership to each piece of property. It is that determination that decides who is to have the burden of proof.[1] If, as of the time of death, the circumstances surrounding a piece of property indicate that it belongs to the decedent, then the burden of proof is on the claimant to prove otherwise.

In this case there was nothing, as of the date of death, to indicate that the money was anything other than the property of the decedent. It was in a savings account in the name of the decedent alone and had been there for four years. Her ability to control the flow of money in and out of the account is equivalent to possession of jewelry or stock certificates. There are countless reasons why decedent might have put the proceeds in her personal account. The burden is not upon appellees to show how appellant's interest was lost. Because the apparent owner as of the date of death was decedent, it is appellant's burden to establish whatever interest she might have. The lower court properly placed this burden on her.

It is next necessary to determine whether appellant has met that burden. Because the court below held that appellant and her husband were incompetent to testify under the "Dead Man's Act", the Act of May 23, 1887, P. L. 158, §5e, 28 P.S. §322 (a subject that will be discussed more fully below), the bulk of the testimony was given by appellant's daughter. When analyzing

---

[1] For a similar situation in which the apparent title to property determines whether jurisdiction is in the Orphans' Court or the Court of Common Pleas, see *Eberhardt v. Ovens*, 436 Pa. 320, 259 A. 2d 683 (1969), and the Concurring Opinion of JONES, J. at 322.

her testimony it must be remembered that appellant must establish an interest in the bank account; it is not sufficient that she show that a joint tenancy existed in the real property. Because of the many objections that were sustained to the daughter's testimony, it is difficult to piece together a coherent story with respect to the decedent's intentions. The record does, however, disclose the following: "Q. During this time that she lived with your mother and father did she ever discuss the sale of the Brobst Street property with you? A. Yes. Q. What did she tell you? A. She told me she was lucky to get what she got for the property and that it went so fast, normally it doesn't, and that now everything would be set; that when she would go it would be all taken care of, and that Mom would have the money that came from this property. Q. Did she tell you what she did with that money that came from the property? A. Yes. Q. What did she tell you? A. She told me that she deposited it."

And later: "Q. Did your grandmother tell you, 'I want this,' or 'I want that,' or did she talk in the third person? How did she talk? A. She talked as herself, that is what she wanted She said, 'Mom'—she called my mother 'Mom'—'should get the house, see that she gets the house money.' Q. See that she gets the house money? A. Yes."

And finally: "Q. Did she ever tell you where the house money was? A. Yes. Q. Where? A. Deposited in the bank. . . ."

The testimony most favorable to appellant is to the effect that during one discussion about the bank account decedent told the witness that she had changed her will so that instead of appellant receiving the whole estate the three grandchildren would receive it. Combining this with the statement that "when she would go it would be all taken care of, and that Mom would have the money . . ." could lead to the conclusion that dece-

dent felt that the right of survivorship would cause appellant to receive the money immediately on her death. However, the rest of the testimony is not consistent with that conclusion. The daughter testified decedent said, "Mom . . . should get the house, see that she gets the house money." A joint tenancy with right of survivorship not only carries the possibility of owning the whole in the future; it also carries the right to use of the property in the present. The testimony indicates decedent only thought appellant would have rights in the future, and nowhere is there any indication that she felt appellant had any right to the use of the money at that time. Also, if such a tenancy were intended, there would have been no need to ask the daughter to "see that she gets the house money." The money would have gone to appellant automatically, and such a statement is consistent with the idea that decedent wanted her grandchildren to give their mother out of their inheritance an amount equal to the proceeds from the sale of the house. The one thing that can be said about the testimony is that it does not satisfy appellant's burden of proving that she had an interest of any type in the bank account.

It is appellant's final contention that the lower court erred in finding her and her husband incompetent to testify under the "Dead Man's Act." As we stated in *Hendrickson Estate,* 388 Pa. at 45: "Under this exception three conditions must exist before any such witness is disqualified; (1) the deceased must have had an actual right or interest in the matter at issue, i.e., an interest in the immediate result of the suit; (2) the interest of the witness—not simply the testimony—must be adverse; (3) a right of the deceased must have passed to a party of record who represents the deceased's interest." See also *Matthews Estate,* 431 Pa. 616, 246 A. 2d 412 (1968). The difficulty with a case such as this is that it is not possible to decide whether

the three conditions have been met without deciding the ultimate issue. That is, we would need to decide that a joint tenancy with right of survivorship did exist in the proceeds before we could decide that appellant was qualified to testify as to that very issue.

To break this circle we stated in *Ford Estate*, 431 Pa. at 187 (quoting from the trial court) : "A problem has always existed in the application of this statute (Dead Man's Act) to controversies between an estate and one who claims property originally owned by the decedent but allegedly the subject of inter vivos transfer to such person. The difficulty stems from the fact that there are . . . two parties with a possible interest in the property, each of whom might have an interest adverse to that of the decedent, depending on whether the transfer is valid or not, which is, however, the ultimate issue. This Gordian knot is cut by determining whether the gift or transfer is prima facie valid; with this determined, it becomes possible to decide to whom the decedent's interest has passed, and the other party to the controversy is rendered incompetent."

Although this case is not factually identical to *Ford Estate*, or *Donsavage Estate*, in that the question is not whether an inter vivos gift was made of property which decedent owned throughout his life, the solution proposed in those cases is helpful. The difference between this case and *Ford Estate*, *Hendrickson Estate* and *Donsavage Estate*, is that appellant at one time did receive an interest in real property from decedent. It is appellant's position that once she established she was a joint tenant with right of survivorship with respect to the real estate she was rendered competent to testify as to any matters pertaining to the real estate or its proceeds. What she neglects, however, is that as of the date of death the proceeds apparently were the property of decedent alone. Therefore, the situation as of the date of death is like that in *Donsavage*

and *Hendrickson* in that appellant is claiming that she has an interest in property which appears to be that of decedent alone. We must look at the apparent title as of the date of death and can not look at what has happened before. As stated, it is appellant's burden to show from what has happened before that the true state of the title is something other than what it apparently is. This is appellant's burden as to the ultimate issue. As to the "Dead Man's Act," her burden is showing a prima facie interest in the proceeds; that is, showing prima facie, that decedent intended her to have some interest in that account. As the testimony does not reveal such an interest, the lower court properly excluded the testimony of appellant and her husband.

Decree affirmed. Costs on the Estate.

----

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I would reverse the decree of the trial court and hold that the burden of proof on the issue of ownership was erroneously placed on the appellant. The simple principle which controls ownership disputes is that the person or entity with the clearest prima facie ownership is entitled to retain possession and title unless and until another party comes forward with evidence sufficient to overcome the effect of the prima facie case. I do not believe that this general principle is any different where one of the claimants is a decedent's estate, and I feel that our case law is entirely consistent with this view. Unfortunately, the majority has misconstrued our prior case law and erroneously abandoned the general principle in this class of cases.

A brief summary of the facts of the four leading cases in this area will be helpful in understanding the problem. In *Culhane's Estate*, 334 Pa. 124, 5 A. 2d 377 (1939), the decedent placed in her own safe deposit box a sum of money which represented the entire

proceeds of a distribution with respect to a bank account in which she and the claimant had a joint interest. In *Hendrickson Estate*, 388 Pa. 39, 130 A. 2d 143 (1957), the decedent's daughter claimed that a diamond ring, which was her mother's and which was in the decedent's possession from the date of his wife's death until his own demise, had been given to her by her mother before her death and was in the decedent's possession merely for safekeeping. In *Donsavage Estate*, 420 Pa. 587, 218 A. 2d 112 (1966), one of the decedent's close friends claimed ownership of several stock certificates which turned up in her possession shortly after decedent's death endorsed in blank and which she claimed decedent had given her three days before he passed away. And in *Pappas Estate*, 428 Pa. 540, 239 A. 2d 298 (1968), the decedent's brother, who had lived with the decedent, claimed ownership by virtue of gift of numerous unendorsed stock certificates which turned up in his possession shortly after decedent's death.

The circumstances of this case are most closely analogous to those of *Culhane's Estate*, where we held that the estate, through the accountant, had the burden of showing that the funds were the decedent's and that the joint tenant had not retained her one-half interest. The majority admits that *Culhane's Estate* is the most apposite of the cases, but asserts that the later decisions undermined its holding. It is at this point that I disagree with the majority, since I believe that the subsequent decisions are consistent with *Culhane's Estate* and merely represent the proper application of the general principle to different fact situations. In each of the three subsequent decisions the strongest case of prima facie ownership lay in the estate, and the burden of proof was therefore properly allocated in accordance with the general principle. I do not believe that the cases stand for the proposition that the burden

of proof on the issue of ownership *always* lies with the party whose claim is adverse to the estate regardless of which claimant has the strongest case of prima facie ownership.

Applying the general principle to the instant case, it is clear that the appellant has established the strongest case of prima facie ownership. It was uncontroverted that the funds in the disputed bank account represented the proceeds from the sale of the suvivorship property, and there was no indication that appellant ever relinquished her right to the fund.* As in *Culhane,* the estate ought to bear the burden of proof on the issue of ownership.

---

* The effect of the majority decision is that the estate's unexplained possession of the proceeds from the sale of the survivorship property created a presumption of a valid inter vivos gift, a ruling which is directly contrary to all prior case law on the subject, see, e.g., *Martella Estate,* 390 Pa. 255, 135 A. 2d 372 (1957), and cases cited therein.